**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

UNITED STATES OF AMERICA

-vs-                                                                    Case No.:  2:05-cr-38-FtM-29SPC

SERGIO BALANTE PALAFOX

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

_____This matter comes before the Court on the Defendant's Motion to Suppress (Doc. #69) filed on August 2, 2005, and the Defendant's Supplemental Motion to Suppress Stop and Search of Vehicle and Subsequent Search of Residence (Doc. #97) filed on August 22, 2005.  The Government filed its Response in Opposition to the Motion to Suppress Stop and Search (Doc. #81)  on August 10, 2005, and its Response to Motion as To Sergio Balante Palafox and Rosario Lopez's Motion to Adopt Palafox's Motion to Suppress (Doc. #99), filed on August 31, 2005.

On September 21, 2005, a hearing was held before the Honorable Sheri Polster Chappell United States Magistrate Judge regarding the Defendant's Motion to Suppress and the Supplemental Motion to Suppress Stop and Search of Vehicle and Subsequent Search of Residence.  At the hearing, the Government was represented by Assistant United States Attorney Jesus Casas.  The Defendant was present and represented by Court Appointed Counsel Josephine Gagliardi.  The Government called as witnesses Sergeant Cliff Deutsch, Special Agent Mitchell Price, Special Agent Sean McDonough, Deputy John Poling, and Special Agent Jose Diaz.  The Defendant, Sergio Balante Palafox after consulting with counsel chose not to testify.

## FACTS

**Sergeant Cliff Deutsch**: (Tr. 4- 40)

Cliff Deutsch is a Sergeant with the Special Operations and K-9 division of the Collier County Sheriff's Office (CCSO). (Tr. 4). He was on duty on April 11, 2005, and conducted a traffic stop of a vehicle driven by an individual who was identified as Omar Armenta.[1] (Tr. 5:19-22). The traffic stop was conducted as a result of the Defendant traveling 58 miles per hour in a 45 mile per hour zone as well as based upon Sgt. Deutsch's observations that the Defendant was following the vehicle in front of him too closely.[2] (Tr. 5:23-25, 6:1-6). Sgt. Deutsch approached the vehicle, made contact with the Defendant, and advised him of the reasons for the stop. He noticed that the Defendant appeared to be nervous, was shaking, flushed, and was inconsistent in his answers as to where he was coming from. (Tr. 9:12-19). The Defendant was unable to supply the numeric of his address on Hunter Boulevard. (Tr. 9:20-22). He conversed with the Defendant in English. (Tr. 9:1-3). Sgt. Deutsch asked the Defendant whether there were any controlled substances in the vehicle. (Tr. 10:19-25). When he asked the Defendant specifically about marijuana, the Defendant looked down and hesitated before giving a response. (Tr. 10:25, 11:1-3). Sgt. Deutsch asked for consent to search the vehicle. (Tr. 11:4-8). The Defendant consented to the search of the vehicle. (Tr. 11:6-8).

---

[1] The Defendant supplied a Mexican driver's license with the name of Omar Armenta which Sgt. Deutsch in his training and experience determined to be fraudulent. Armenta was later identified as Sergio Balente Palafox.

[2] The Defendant was clocked using a Stalker Radar device. This device was new and therefore calibrated from the manufacturer.

-2-

Sgt. Deutsch deployed his K-9, Czar,³ who alerted to the driver's front door of the vehicle. (Tr. 11:9-11). After the alert, Sgt. Deutsch opened the driver's front door and allowed Czar to enter the passenger compartment of the vehicle. (Tr. 12:12-18). Czar once again alerted to the area in the back seat between the bottom seat and back seat cushion leading into the trunk area. (Tr. 12:15-18). Sgt. Deutsch then conducted a physical search of the vehicle. (Tr. 12:19-24). He used the keys from the ignition to open the trunk. (Tr. 34:11-16). Upon opening the trunk, he smelled a very strong odor of marijuana. (Tr. 35:2-5). Inside the trunk area, he located a dark green plastic bag. (Tr. 13:1-4). He once again deployed Czar who alerted on the bag. (Tr. 13:5-13). Upon opening the bag, Sgt. Deutsch located plastic wrappings with tape that appeared to form large rectangular shaped bundles. (Tr. 13:16-19). He noted a green leafy substance inside the wrappings. (Tr. 13:20-25). This substance was subsequently field tested and was positive for the presence of THC. (Tr. 13:20-25). By the appearance of the large bundles, Sgt. Deutsch felt that they could have contained several hundred pounds of marijuana. (Tr. 14:1-7).

Sgt. Deutsch placed the Defendant under arrest and advised him of his Miranda rights. (Tr. 36:12-17). He told the Defendant that if he wanted to help himself out, he would get in touch with an agent from the Drug Enforcement Agency (DEA) task force who would speak with him. (Tr. 14:11-20, 36:21-25, 37:1-5). The Defendant agreed to cooperate. (Tr. 14:14-16).

**Special Agent Mitchell Price** : (Tr. 40-69).

Mitchell Price is a Special Agent with the DEA Task Force and has been in that capacity for the past seven and one half years. (Tr. 41:1-4). He responded to a traffic stop on April 11, 2005.

---

³Czar is 2 ½ years old and has been on the road for approximately six (6) months. Czar is a Certififed Narcotics Dog. In his time on the road, he has had no false alerts.

After arriving at the scene and making contact with Sgt. Deutsch, he observed the wrappings which had been located in the trunk. (Tr. 42:3-9). He noted that they were consistent with the way bundles of marijuana were packaged for shipment into the United States. (Tr. 42:3-9). Spec. Agt. Price spoke with the Defendant and told him that he wanted to retrieve the marijuana which had been in the packages, and asked if he would be willing to take them to where the marijuana was located. (Tr. 43:12-18). The Defendant was unable to supply the numeric of the address, but told Agt. Price that he would take him to where the marijuana was located on Hunter Boulevard. (Tr. 43:19-25). Other agents and law enforcement officers were called in.

The Defendant directed the officers to 2244 Hunter Boulevard. (Tr. 46:6-13). Spec. Agt. Sean McDonough, Spec. Agt. Jose Diaz, Deputy John Poling, and the Defendant approached the front door of the residence while Spec. Agt. Price approached the rear of the residence. (Tr. 46:14-19). The Defendant told the officers that there were other individuals in the residence - two males and one female. (Tr. 48:17-21). As Spec. Agt. Price approached the rear of the residence, a male darted out of the sliding glass door onto the lanai. (Tr. 47:1-3). Spec. Agt. Price ordered him to the ground. (47:4-7). This individual was later identified as Rosario Lopez. (Tr. 47:13-16).

At that time, the Defendant was brought to the rear of the residence where he signed a Consent to Search Form (Govt. Ex. #1). (Tr. 49:9-25, 50:1-5). Spec. Agt. Price indicated that he did not pressure the Defendant to cooperate, did not use a harsh tone with him, and did not pressure him to sign the document. (Tr. 54:6-13). Prior to the search, during a protective sweep of the residence, an individual later identified as Ulises Colomo-Martinez was located in the bathroom of the residence.(Tr. 50:13-23). During a search of the residence, the officers located nearly six hundred (600) pounds of marijuana in a rear bedroom of the residence. (Tr. 50:8-9).

The Defendant continued to cooperate with the agents. He signed a Consent to Search Form (Govt. Ex. #3) for a cellular telephone, and participated in a controlled call to one of the individuals whose number was located on the phone. (Tr. 51:23-25, 52:1-5, 53:10-16).

During cross examination, Agt. Price admitted that he had been investigating drug activity at the Hunter Boulevard address. (Tr. 57:19-25). In fact, on that day, there had been surveillance of the residence. (Tr. 57:19-25, 68:11-14). He also admitted that he had personally contacted Sgt. Deutsch and had told him that he may want to "take a look at" a vehicle which he described as a white, four door, Pontiac, Bonneville but that he never directed Sgt. Deutsch in any manner in how he was to conduct his examination. (Tr. 57:1-9).

**Special Agent Sean McDonough**: (Tr. 69-97)

Sean McDonough is a Special Agent with the DEA Task Force and has been so employed for the past twenty (20) years. (Tr. 70:3-7). On April 11, 2005, he responded to a residence on Hunter Boulevard. (Tr. 70:11-17). He, Spec. Agt. Jose Diaz, Deputy John Pulling and the Defendant approached the front door of the residence. (Tr. 71:8-11). At that time, he could smell an odor of marijuana. (Tr. 75:20-24). The Defendant did not have his keys so they knocked on the door. (Tr. 72:5-9). The window curtains moved and Agt. McDonough observed an individual looking out. (Tr. 72:13-15). He then heard a commotion at the rear of the residence. (Tr. 73:6-10). Spec. Agt. Diaz stayed with the Defendant while he responded to the rear of the residence where he observed Spec. Agt. Price had an individual down on the lanai. (Tr. 73:11-21). Because of a fear of other individuals in the house, and destruction of evidence, the agents did a protective sweep of the house. (Tr. 73:24-25, 74:1-10). During the sweep, another individual was located in the bathtub/shower area of the

residence. (Tr. 75:3-7). Also in plain view in the bedroom area were several bails and broken down bags of marijuana. (75:16-19).

Spec. Agt. McDonough observed the Defendant sign the Consent to Search Form (Govt. Ex #1). (Tr. 77:9-13). He testified that although the Defendant was hesitant to have his name appear on the form because of fear of reprisal from other individuals involved in the offense, he was not hesitant to give his consent. (Tr. 76:8-15). After the Defendant signed the form, a woman who identified herself as Ms. Gomez arrived at the scene. (Tr. 79:23-25, 80:1-3). She indicated that she received money from the occupants and then paid the owner the rent. (Tr. 80:4-11). She indicated that she was on the lease. (Tr. 80:5-7). She was also shown a Consent to Search Form and voluntarily signed it. (Tr. 80:9-13). She was then allowed to leave the scene.[4] (Tr. 80:20-25). The actual search of the residence occurred after the consent to search was signed. (Tr. 80:16-19). Subsequent to the search, Spec. Agt. McDonough interviewed the Defendant in English at the DEA office. (Tr. 81:15-25, 82:1-6).

Spec. Agt. McDonough admitted during cross examination that the residence at 2244 Hunter Boulevard had been under surveillance prior to the traffic stop of the Defendant. (Tr. 83:4-6). He personally saw the Defendant place a large shopping bag into the trunk and assumed it to be contraband. (Tr. 83:12-21). Although he did not know the Defendant by name, he was aware of his physical characteristics. (Tr. 84:24-25, 85:1).

---

[4]As of the date of the hearing, Ms. Gomez' whereabouts are unkonwn.

**Deputy John Poling**: (Tr. 97-112).

John Poling is a Deputy Sheriff with the CCSO assigned to the Vice and Narcotics squad. (Tr. 97:23-25, 98:1). He has been with the CCSO for just under eight (8) years. (Tr. 98:1-4). On April 11, 2005, he responded as back up to Sgt. Deutsch. (Tr. 98:8-16). While at the traffic stop, he noticed the Defendant's knees buckle due to what he described as nervousness. (Tr. 106:19-23, 108:6-18). He was involved in transporting the Defendant to the 2244 Hunter Boulevard address. (Tr. 99:7-17).

**Special Agent Jose Diaz**: (Tr. 113-128).

Jose Diaz is a Special Agent with the DEA. On April 11, 2005, he responded to the 2244 Hunter Boulevard address. (Tr. 113:7-16). He approached the front of the residence with Spec. Agt. McDonough and the Defendant. (Tr. 113:23-25, 114:1-10). As they knocked on the door, someone looked out of the window. (Tr. 114: 9-14). He then heard Spec. Agt. Price at the rear of the residence giving loud commands. (Tr. 114:17-20). He could smell an odor of marijuana at the front door. (Tr. 114:14-16). He stayed with the Defendant at the front door until someone opened it from inside. (Tr. 114:21-23). He and the Defendant then walked through the residence to the back lanai area. (Tr. 114:23-25,115:1-5). He then presented the Defendant with a Consent to Search Form (Govt. Ex. #1) which was written in Spanish. (Tr. 116:5-10). He read it to him in Spanish, gave it to the Defendant to read, and asked the Defendant to initial the paragraphs and sign it. (Tr. 116:5-10). The Defendant did so in his presence. (Tr. 116:5-10). Although the Defendant was concerned that people were going to see his signature on the form, he did not appear to be concerned about signing the form to give consent. (Tr. 117:6-12).

When Ms. Gomez arrived, he went through the same procedures with her. (Tr. 117:22-25, 118:1-7). He gave her a Consent to Search Form (Govt. Ex. #4) in Spanish, read it to her, gave it to her to read, and had her sign it in his presence. (Tr. 118:14-20). He testified that the Defendant was cooperative with them, and that the Defendant had no difficulty understanding English or Spanish. (Tr. 115:9-21).

Spec. Agt. Diaz admitted at hearing that he was advised prior to his arrival that they were looking for a white vehicle and that there was surveillance due to possible narcotics activity. (Tr. 121:1-21).

**DISCUSSION**

The Defendant makes two arguments in his Motion, first that the traffic stop was illegal and therefore, there was no cause to search the Defendant's vehicle, and second there was no valid consent to search the residence at 2244 Hunter Blvd. in Naples, Florida.

*(1) Whether the Traffic Stop of the Defendant's Vehicle was Valid*

The Fourth Amendment protects individuals from unreasonable search and seizure. U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) *cert. denied,* 534 U.S. 830 (2001). However, temporary detention of a motorist during a traffic stop is constitutional if probable cause exists to believe a traffic violation has occurred. Whren v. U.S., 517 U.S. 806, 810, 116 S.Ct. 1769, 1772 (1996). The Fourth Amendment test for a traffic stop is whether a reasonable officer would have stopped the car for the purpose of enforcing the traffic violation. Id. Thus, in order to determine whether or not a specific Fourth Amendment requirement such as probable cause or reasonable suspicion has been met, the court must determine if the officer's actions were reasonable. Ornelas v. U.S., 517 U.S. 690, 696, 116 S.Ct. 1657, 1661-1662 (1996).

"Nothing in the Constitution prohibits a police officer who permissibly has stopped an individual from requesting permission to conduct a search even if he has no basis for suspecting that the individual is carrying any contraband." U.S. v. Strickland, 902 F.2d 937, 941 n. 3 (11th Cir. 1990). However, once the purposes of the initial traffic stop are completed, the officer cannot further detain a vehicle or its occupants unless something occurred during the traffic stop that created a reasonable suspicion to justify further detention. U.S. v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (citing U.S. v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995).

Sgt. Deutsch clocked the Defendant traveling fifty-eight (58) miles per hour in an area with a posted speed limit of forty-five (45) miles per hour. (Tr. 5:23-23, 6:1-6). In addition to the excessive speed, Sgt. Deutsch testified that he observed the Defendant's vehicle traveling too close to the rear of the vehicle in front of the Defendant.(Tr. 5:23-23, 6:1-6). Exceeding a posted speed limit and/or traveling to close to a vehicle in front of a person is a violation of Florida's traffic laws. Fla. Stat. § 316.189 (stating that violation of the posted speed limits must be cited as a moving violation); Fla. Stat. § 316.0895 (stating the driver of a vehicle shall not follow another vehicle more closely than is reasonable and prudent). Thus, Sgt. Deutsch acted in a reasonable manner when he stopped the Defendant's car. Whren, 517 U.S. at 810.

During the hearing, the Defendant's Counsel argued that the traffic stop was merely a pretext for the ongoing drug surveillance that was being conducted at the Hunter Blvd. residence. However, the constitutional reasonableness of a traffic stop does not depend upon the subjective motivations of the officer who stopped the vehicle. Id. at 814; State v. Rodriquez, 904 So. 2d 594, 597 (Fla. 5th DCA 2005). Thus, under the circumstances Sgt. Deutsch acted reasonably and did not violate the Fourth Amendment by stopping the Defendant.

After the stop, Sgt. Deutsch asked the Defendant whether there were any controlled substances in the vehicle. (Tr. 10:19-25). When he asked the Defendant specifically about marijuana, the Defendant looked down and became and hesitated before giving a response. (Tr. 10:25, 11:1-3) Sgt. Deutsch then asked for consent to search the vehicle. (Tr. 11:4-8).

Sgt. Deutsch travels with a K-9, Czar, and Czar was with him on the day he stopped the Defendant and therefore, there was no undue delay caused by the K-9 search. According to Sgt. Deutsch, the Defendant consented and he proceeded with the search. In his Motion, the Defendant denies granting consent and argues that there was no probable cause to conduct the search. However, it is well established that a sniff by a drug dog does not constitute a search within the meaning of the Fourth Amendment. Holloman, 113 F.3d at 192. Therefore, reasonable suspicion is not needed before a drug detection dog may make a sniff of the exterior of the vehicle. Hearn v. Board of Public Educ., 191 F.3d 1329, 1332 (11th Cir. 1999), *cert. denied,* 529 U.S. 1109 (2000). Since a vehicle sniff by a K-9 does not constitute a search within the meaning of the Fourth Amendment, Sgt. Deutsche was within the constitutional limits by conducting the K-9 sniff search of the Defendant's vehicle.

Sgt . Deutsch testified that Czar alerted to a controlled substance at the drivers side door. (Tr.11:9-11). Based on Czar's alert, Sgt. Deutsch searched the vehicles interior for contraband. The alerting of a drug sniffing dog to a person's property supplies not only reasonable suspicion, but probable cause to search that property. Id. at 1333; United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) (probable cause arises when a drug trained canine alerts to drugs). Once inside the vehicle, Czar alerted to the area in the back seat between the bottom seat and back seat cushion leading into

the trunk area. (Tr.12:15-18). Sgt. Deutsch used the keys from the ignition to open the trunk. 34:11-16). Upon opening the trunk, he smelled a very strong odor of marijuana. (Tr. 35:2-5).

He re-deployed Czar, and Czar alerted to a dark plastic bag in the trunk. (Tr. 13:5-13). In his Motion, the Defendant also claims that the search of the closed plastic bag in the trunk of the vehicle amounts to a warrantless search and therefore, violated his Fourth Amendment rights. However, when the property alerted to is in a vehicle, the Constitution permits a search of the vehicle immediately, without resort to a warrant. Hearn, 191 F.3d at 1333. Thus, Sgt. Deutsch's search of the vehicle and subsequent search and seizure of the bag in the trunk were not violations of the Fourth Amendment.

*(2) Whether the Search of the Residence Located at 2244 Hunter Blvd. in Naples, Florida Violated the Fourth Amendment*

With the Court's leave, the Defendant Palafox filed a Supplemental Motion to Suppress on August 22, 2005. In that Motion, the Defendant states that he did not give consent to search the residence at 2244 Hunter Blvd. and that the officers entered the residence without consent or a warrant in violation of the Fourth Amendment.[5] It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. U.S v. Santa,

---

[5] The Co-Defendant Rosario Lopez moved the Court to adopt the Supplemental Motion stating that he had a privacy interest in the residence. However, that motion was denied by the Court. While the Defendant Lopez claimed a privacy interest he never stated whether he was a tenant, a resident, a leasee, or if he had an ownership interest in the subject property. Therefore, his alleged standing lacked a factual basis for the claimed privacy interest. *See* U.S. v. Sneed, 732 F.2d 886, 888 (11th Cir. 1984) (holding that the defendant has the burden of establishing a legitimate expectation of privacy). The concepts of due process do not require that a defendant who fails to make a showing of the fundamental allegations in his motion to suppress be afforded a pretrial hearing on his motion. Id. As such, the Court determined that Lopez did not have standing to join the Supplemental Motion to Suppress.

236 F.3d 662, 668 (11th Cir. 2000) (citing <u>Payton v. New York</u>, 445 U.S. 573, 586. 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).  There are two questions raised in this case by the search of the residence, first was the search consensual, and second if the search was not consensual, was there sufficient exigent circumstance to allow the search without a warrant.

*(a) Whether the Residence Search was Consensual*

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." <u>Illinois v. Rodriquez</u>, 497 U.S 177, 181, 110 S. Ct. 2793, (1990).  Officers without a warrant or probable cause may conduct a search based upon the voluntary consent of the property owner. <u>Schnecklin v. Bustamonte</u>, 412 U.S. 218, 219, 93 S. Ct. 2042 (1973).   Valid consent to search the premises may also be given by a third person who possesses common authority over the premises.  <u>U.S. v. Matlock</u>, 415 U.S. 164, 171 n. 7. 94 S. Ct. 988, 993 n. 7 (1974); *See* <u>U.S. v. Watchmaker</u>, 761 F.2d 1459, 1473 (11th Cir. 1985) (holding that it is reasonable to recognize that any of the co-inhabitants of an apartment has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the apartment to be searched).

In evaluating whether a consent is voluntary, the Eleventh Circuit has said that the court must take into consideration several factors such as: the Defendant's custodial status, the extent that the Defendant understands his right to refuse consent, the extent of the Defendant's cooperation, his education and intelligence, and the Defendant's belief that incriminating evidence will not be found. <u>U.S. v. Simms</u>, 385 F.3d 1347, 1355 (11th Cir. 2004).  In addition to express consent, consent may be implied by the circumstances  surrounding the search, by the persons prior actions or agreements,

or by the person's failure to object to the search. U.S. v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002); *Thirty Fourth Annual Review of Criminal Procedure,* 86 (34th ed., Geo. L.J. 2005). The Defendant argues, in his Motion that he never gave his voluntary consent because English is a second language and that he did not fully understand the consequences of what was being asked of him.

After Sgt. Deutsch found contraband in the Defendant's vehicle, he arrested the Defendant. Therefore it is not contested that the Defendant knew he was in custody. Sgt. Deutsch testified that he then asked if the Defendant would like to cooperate with law enforcement. (Tr. 14:11-20, 36:21-25, 37:1-5). The Defendant said yes and Sgt. Deutsch called Spec. Agt. Price of the DEA to assist with the Defendant. (Tr.14:14-16, 42:3-9). Spec. Agt. Price told the Defendant that they wanted to know where the marijuana he had transported in his trunk was located. (Tr. 43:12-18). According to Spec. Agt. Price, the Defendant did not know the numerical address of the residence but agreed to take them to the residence where the marijuana was located. (Tr.43:19-25). The officers testified that they did not pressure the Defendant to cooperate, did not use a harsh tone with him, and did not pressure him to consent to a search. (Tr.54:6-13).

Before arriving at the residence, the Defendant informed the officers that two males and a female were at the residence. (Tr. 48:17-21). The Defendant further demonstrated his cooperation by signing a consent to search form, written in Spanish, for his cell phone and agreed to make a controlled phone call to one of the numbers stored in the cell phone's call list. (Gov't. Exhibit 3). Thus, the Defendant clearly demonstrated a willingness to cooperate with the agent's investigation.

As for his understanding of the circumstances surrounding his cooperation, the Defendant in his Motion never argued that he could not speak English, but merely that it was not his first language and he did not understand what was being requested of him. While the Defendant used an interpreter during the hearing, all of the officers testified that they used either English or a combination of English and Spanish to communicate with the Defendant and that he fully understood what was said and the consequences of his actions.(Tr. 115:14-19,116:5-10).

After listening to the testimony presented at the hearing and watching the demeanor of the officers on the stand and considering the Plaintiff's interest in the outcome of the hearing, the Court finds the officers and agents testimony that the Defendant could understand English and had the required knowledge to give voluntary consent to be very credible. U.S. v. Ramirez-Chilel, 289 F.3d 744, 749-750 (11th Cir. 2002).

Once at the residence Spec. Agts. Diaz and McDonough along with the Defendant approached the front door. (Tr.113:23-25, 114:1-4). As they knocked on the door, someone looked out of the window. (Tr. 72:13-15, 114:9-14). Agt. Diaz stated he heard Spec. Agt. Price at the rear of the residence giving loud commands and that he and Spec. Agts. McDonough and Diaz testified that they could smell an odor of marijuana while standing at the front door. (Tr. 75:20-24,114:14-160). Based on the commotion at the rear of the residence and with the knowledge that others were possibly still in the residence, the agents decided to conduct a protective sweep of the residence. (Tr.114:14-16).

After officers had conducted a protective sweep of the residence, the Defendant signed a consent to search form written in Spanish. (Tr. 77:9-13). Spec. Agt. Diaz testified that he read the form to the Defendant in Spanish, gave it to the Defendant to read, and asked the Defendant to initial

the paragraphs and sign it. The Defendant did so in Spec. Agt. Diaz' presence. Spec. Agt. Diaz said although the Defendant was concerned for his safety, because of the other defendants, if he put a signature on the form, he did not appear to be concerned about signing the form to give consent. (Tr. 76:8-15, 117:6-12). Thus, after reviewing the testimony and evidence presented during the hearing, the Court finds that the Defendant understood the consequences of his actions and sufficiently demonstrated his willingness to cooperate. Thus, the Court finds that the Defendant's consent to search the residence was voluntarily given.

Furthermore, Spec. Agt. McDonough testified that while they were at the residence, Carmen Gomez arrived. Gomez indicated that she received money from the occupants and then paid the owner the rent. (Tr.79:23-25, 80:1-3). She further indicated that her name was on the lease. (Tr. 80:4-11). She was also shown a Consent to Search Form written in Spanish by Spec. Agt. Diaz. Spec. Agt. Diaz testified that he went through the same procedures with Gomez as he followed with the Defendant and that she voluntarily signed the consent. (Tr.118:14-20). Gomez was then allowed to leave the scene. (Tr. 80:20-25).

While Gomez was not present to testify, her consent to search form was entered into evidence without objection from the Defendant. (Gov't. Exhibit 4). The case law is clear that valid consent to search the premises may also be given by a third person who possesses common authority over the premises. Matlock, 415 U.S. at 171 n. 7. Consent given even after an illegal search has occurred is generally considered invalid, however, consent to search given after a valid security sweep is valid. U.S. v. Calhoun, 49 F.3d 231,234 (6th Cir. 1995); *See* U.S. v Gonzalez, 71 F.3d 819, 831-832 (11th Cir. 1996) (holding an illegal search valid when consent was given after the search because the

homeowner stated that the search did not coerce him to consent). Thus, the officers on the scene had the voluntary consent of the Defendant as well as Gomez to search the residence.

*(b) Whether Sufficient Exigent Circumstances Existed to Search the Residence Without a Warrant*

A warrantless search is allowed, where both probable cause and exigent circumstances exist. U.S. v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991). The general requirement that a search warrant be obtained is not lightly to be dispensed with, and the burden is on those seeking the exemption from the requirement are required to show the need for entering a residence without a warrant. Santa, 236 F.3d at 669 (citing U.S. v. Lynch, 934 F.2d 1226, 1232 (11th Cir. 1991)). The exigency exception only applies when the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action. U.S. v. Burgos, 720 F.2d 1520, 1526 (11th Cir. 1983). Recognized situations in which exigent circumstances exist include: "danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and hot pursuit of a fleeing suspect." Santa, 236 F.3d at 669 (citing U.S. v. Blasco, 702 F.2d 1315, 1325 (11th Cir. 1983)). The Eleventh Circuit has noted that the need to invoke the exigent circumstance exception to the warrant requirement is particularly compelling in narcotics cases because narcotics can be quickly destroyed. Santa, 236 F.3d at 669. However, the test of whether exigent circumstances exist is an objective one. Id. The proper inquiry is whether or not the facts would lead a reasonable experienced agent to believe that evidence might be destroyed before a warrant could be secured. Id.

In this case, the officers had been informed by the Defendant that at least three people, two males and one female, were inside the residence. (Tr. 48:17-21). Spec. Agt. Diaz and Spec. Agt. McDonough both testified that they approached the front of the residence with the Defendant. As

they knocked on the door, someone looked out of the window. (Tr. 72:13-15, 114:9-14). They then heard Spec. Agt. Price at the rear of the residence giving loud commands. (Tr. 114:17-20). Both Spec. Agts. Diaz and McDonough stated that they could smell an odor of marijuana while standing at the front door. (Tr. 75:20-24,114:14-16)

Given the facts presented by Spec. Agts. Diaz and McDonough that they had knowledge that the people in the house were in possession of marijuana, the agents could smell the odor of marijuana from the front door, that someone had fled the house out the back, and that others were possibly still present in the residence, the required exigent circumstances were present to enter the residence and conduct a protective sweep. Santa, 236 F.3d at 669. Based upon those exigent circumstances, a sweep of the residence was conducted. During the sweep, another individual was located in the bathtub/shower area of the residence. (Tr. 75:3-7). Also in plain view in the bedroom area were several bails and broken down bags of marijuana. (Tr. 75:16-19). The agents then requested that the Defendant sign the consent to search form and the actual search of the residence occurred. (Tr. 76:8-15, 77:9-13, 116:16-19).

Thus, after review of the record and listening to the testimony presented at the hearing, the Court respectfully recommends that the Defendant's constitutional rights were not violated. The original traffic stop was conducted pursuant to a valid traffic violation and the subsequent dog sniff established probable cause to search the vehicle and its contents. Further, all of the testimony and evidence led the Court to determine that the search of the residence located at 2244 Hunter Blvd. Naples, Florida was done with voluntary consent and full cooperation of the Defendant.

Accordingly, it is now

**RECOMMENDED:**

The Defendant's Motion to Suppress (Doc. #69) and the Defendant's Supplemental Motion to Suppress Stop and Search of Vehicle and Subsequent Search of Residence (Doc. #97) Motion to Suppress should be **DENIED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this   12th   day of October, 2005.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:
All Parties of Record